Curtis C. Smith and Evelyn Smith v. Commissioner.
Smith v. Commissioner
Docket No. 4395-66.
United States Tax Court
T.C. Memo 1967-241; 1967 Tax Ct. Memo LEXIS 21; 26 T.C.M. (CCH) 1219; T.C.M. (RIA) 67241; December 5, 1967
Robert M. Tyle, 1001-1003 Times Sq. Bldg., 45 Exchange St., Rochester, N. Y., for the petitioners. Leon M. Kerry, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1962, 1963, and 1964 in the amounts of $816.66, $915.82, and $857.79, respectively. Respondent disallowed losses and an investment credit claimed by petitioners in conjunction with the operation of a horse farm. The sole question before us is whether petitioners' operation of the horse farm constituted the carrying on of a trade or business under any of the possibly pertinent provisions of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the *22 exhibits attached thereto, is incorporated herein by this reference. Curtis C. Smith (hereinafter referred to as petitioner) and Evelyn Smith, husband and wife, had their legal residence in Penfield, New York, at the time the petitioner herein was filed. They filed joint Federal income tax returns for each of the calendar years 1962, 1963, and 1964 with the district director of internal revenue, Buffalo, New York. Petitioner has been employed in the employment-industrial relations department of the apparatus and optical division of Eastman Kodak Company since approximately 1934. Since at least 1954 he has been a supervisor, or superintendent, in his department. He is a high school graduate and has taken various extension courses at the Rochester Institute of Technology. These courses consisted of a three-year industrial management program and an office management program in addition to individual courses in job evaluation and industrial psychology. Since 1940 he has also taught courses in human relations at the Institute. This course is taught once a week for thirty weeks each year. Petitioner has always enjoyed horses and for some time prior to 1954 had been looking for a suitable *23 place on which to raise them. In May 1954 petitioner located and purchased a 15-acre farm, his present residence, for this purpose. The farm contained a nine-room house and a barn situated on less than one acre. The barn had eight stalls with a potential of one additional stall. The balance of the acreage was comprised of a small brook, a heavily wooded area, and 10 to 12 acres of wheat. After purchasing the property, petitioner took a single correspondence course in the breaking, training, breeding, and feeding of horses from the time they were foals. Petitioner visited various breeding farms and breeders in New York State and Vermont and thereafter decided upon the raising of Morgan horses for their versatility in show. He named the farm the "Country Life Morgan Horse Farm" and obtained membership in the New York State and National Morgan Horse Societies. In October 1957 petitioner purchased two Morgan fillies - a two-year old, Pandy's Juanita, and a weanling, Bell-O-Mine. [1] The former was bred and had her first foal in 1959 - a filly, Juanita's Pride. The mare was bred again and foaled a colt in 1961 - Country Lad. The mare died in 1962. *24 Bell-O-Mine was ready for breeding and was bred in 1961, foaling a colt, Easter Parader, in 1962. She was bred again and foaled another colt, Penfield Squire, in 1963. In 1964 she foaled a filly, Penfield Lady. All of the above colts were gelded soon after they were two years old. Petitioner takes his horses, particularly Juanita's Pride, to various horse shows each year. These shows are principally in the Buffalo and Syracuse areas and number between three and five annually. The prizes at these shows range up to $200. Considering the expenses in breeding, raising, maintaining, and showing horses, petitioner had no intent to produce a profit strictly from show winnings. In fact, his winnings have been relatively small amounts: $63 in 1962; $121 in 1963; and $10 in 1964. During the years in question petitioner also boarded horses, though his capacities in this area were necessarily limited by the facilities available. His barn had but eight stalls and petitioner's own horses occupied either five or six of these depending upon the year involved. Petitioner has never boarded more than two horses at any one time. His charge for boarding and the use of various facilities is between *25 $30 and $35 per month. Until the year 1965 petitioner used 10 to 12 acres of his land for growing hay, obtaining approximately 10 tons per year. Since 1965 petitioner has used the land for grazing and as an exercise area. At no time however was the hay produced sufficient to feed petitioner's horses. He always required more hay which had to be purchased commercially. Petitioner has not actively advertised or otherwise attempted to sell any of his horses. He has had signs on the property indicating that it was a horse farm, but these were destroyed and have not been replaced. He has however placed complimentary notices in various horse show programs in 1962 and 1964. The ideal time to sell a Morgan horse is when it is a weanling, that is, from the time the foal leaves its dam to January 1 of the following year. About the 15th day of life the horse's silhouette is an indication of his soundness and breed conformation. This silhouette is representative of the characteristics the animal will possess as a three-year old. Unless the horse has stud potential, an investment in maintenance and training is not justified from a profit standpoint. If the horse is not sold when it is a weanling *26 the next real opportunity to sell the animal is when it is three years old. During this period the horse receives some training, which in this case was generally provided by petitioner or by someone under his control and direction. [2] Generally the cost of maintaining a Morgan horse in this area of New York State is approximately $600- $700 annually, and for a three-year period is approximately $1,800-$2,100, exclusive of the costs of training, veterinary fees, other fees, and show expenses. The average prices for Morgan horses as yearlings (one-year olds) were $1,000 for fillies and $700 for colts, and between $2,000 and $2,500 for a trained three-year old. Since its inception the farm has produced losses totaling some $29,000 at the end of the years in question. Petitioners reported farm income, expenses, and net losses on their income tax returns as follows: Taxable
Year
Income
Expenses
Net Loss
1954
$ 720.94
$ 1,522.70
$ 801.76
1955
1,130.80
2,341.48
1,210.68
1956
415.00
2,531.94
2,116.94
1957
600.00
3,009.56
2,409.56
1958
315.00
3,398.80
3,083.80
1959
481.00
3,509.10
3,028.10
1960
345.00
3,954.83
3,609.83
1961
484.00
3,762.14
3,278.14
1962
273.00
3,641.35
3,368.35
1963
471.00
4,008.03
3,537.03
1964
885.00
4,060.22
3,175.22
Totals
$6,120.74
$35,740.15
$29,619.41
*27 Petitioner has no expectation that he will ever recoup these losses and considers that they are merely the cost of the horse breeding operation. As set forth above, petitioners on their Federal income tax returns for the years 1962, 1963, and 1964 deducted net business losses from their horse raising operation in the amounts of $3,368.35, $3,537.03, and $3,175.22, respectively. Respondent in his statutory notice of deficiency disallowed these losses, as well as an investment credit in the amount of $90.75 claimed by petitioners for the calendar year 1964 on property used in the horse raising operation. Opinion The sole question for determination is whether the horse raising activities constituted a trade or business as that term is used in the relevant sections of the Internal Revenue Code of 1954. [3]
*28 In order to carry on a trade or business a person must have an intention to operate for the purpose of making a profit. Though the expectation need not be a reasonable one, the petitioner must show that he had a bona fide intention to, in fact, realize a profit. , affd. (C.A. 2, 1967). The fact that he has experienced only losses to date is not necessarily inconsistent with such an intent, but it is an important factor to be considered in determining the intent. (C.A. 2, 1949), affirming a Memorandum Opinion of this Court, certiorari denied, . Whether a taxpayer operated a farm with the intention of making a profit is a question of fact to be determined from the record in each particular case. Petitioner has not met his burden of proving that he had the requisite intention to make a profit. He has not shown, other than by a general statement, how he intended to operate his horse raising at a profit. He has produced no long range plan which will achieve such a result. *29 Petitioner by his own admission did not hope to recoup the losses suffered from the inception of the enterprise until the end of the calendar year 1964. In , we stated: [The] presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. This factor as well as the record as a whole indicates to us that not only has petitioner failed to meet his burden of proof but that he operated the farm without concern for either current or ultimate profits. On the facts of this case we hold that petitioners did not operate the farm as a trade or business in the years before us and that therefore they are not entitled to a deduction for the losses sustained or to the investment credit claimed. Decision will be entered for the respondent. Footnotes
1. Prior to October 1957 petitioner owned only one horse which he had purchased in 1955 for his daughter. The horse was sold in 1956. This animal was not a part of petitioner's horse raising operation.↩
2. One of petitioner's daughters assisted him, and he also used the services of a neighborhood lad to help in the operation of the farm.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * * SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule. - There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. SEC. 48. DEFINITIONS: SPECIAL RULES. (a) Section 38 Property. - (1) In General. - Except as provided in this subsection, the term "section 38 property" means - * * *
Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable * * * SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income.↩